Good morning, Your Honors. Good morning. George Berger for the appellants. George Berger. May it please the Court, Counsel. Noticing the submitted cases before this one, and also the Court's admonition to not use 15 minutes unless we feel we must, I was tempted to also submit on the briefs. Well, thank you very much. We'll now hear from the... But you've reconsidered. Thank you, Your Honor. I suppose a temptation kept in one's pocket is better than acted out. And I would ask whoever's keeping time to let me know at about five minutes, because I don't think I have more than about five minutes of comments that I'd like to make to kind of crystallize the briefing and perhaps be helpful. And whatever time I have left over, unless any of the panel members has questions, I'm happy to address those. You know, I just might make a little preliminary comment. It looks like Wardlaw was going to get a loan for the project and secure equity investors and the owners of the land were going to put up the land. Then they were going to have this project. He also was going to see if he could get an operator for the hotel. And he appeared to be somewhat instrumental in that, but failed to do the other two. If that should be the result of the case, what do we do about a possible quantum merit recovery, and the only evidence in the case being from your witness that it was worth $10,000 or $15,000 to what he did? Can we say, okay, it's $10,000 or $15,000 or should we remand it for the district court to look at that? Your Honor, the proposition of remand to deal with quantum merit is, of course, a topic that I've thought about a lot and what makes the most sense, I believe, is the following. When one looks at the evidence of quantum merit, there are only two parts to it. One part is, and it's undisputed, that in the industry, the fair value of this work by Mr. Waldman or Ryan Investment was $10,000 to $15,000. The other part of the undisputed testimony is that more often than not, in most instances, the hotel operator, not the landowner, pays that. That in the industry under a quantum merit basis, it is very typical for the hotel operator, in this case the entity loosely known as West Paces, pays that. That's the only testimony in the record. There is no other. Kagan. Well, wouldn't that suggest to some degree that this wouldn't be an issue to be decided on appeal in any event, because even if we went all the way down the road with you to the 10 to 15, that's not a fixed sum and that if we went that far with you, that in any event, it would need to be remanded to the district court on that point. Would you agree? Your Honor, I think that's certainly a sensible result. And there's nothing that comes quickly to mind that says, oh, no, that's not correct, because I suppose there is, and this aspect has not been briefed by either side. There is the aspect of whether or not a plaintiff should be permitted to get two bites. That is, having not presented any expert, any industry data on quantum merit, and having decided to try the case based on its view of contract requirements, is it proper for a court of appeal to send the case back with a suggestion that quantum merit be studied more deeply in view of the fact that plaintiff has already had one bite at that apple. And as I said, that aspect has not been briefed. Mr. Berger, refresh my memory. I mean, I can't recall whether the plaintiff had a quantum merit count in his complaint. Clearly it did. So that went to trial, so to speak, but he didn't introduce any evidence on it? Correct. You said you wanted to be reminded when you had about five minutes. If we give him 10. One more comment in light of the panel members' questions. Not only was there no evidence of a quantum merit recovery presented by the plaintiff, there was no argument about it either to the court at any time. You mean as an alternative form of relief? Even as an alternative form of relief. Thank you. Thank you, Mr. Berger. Good morning. Mark O'Connor on behalf of Appellee. Beginning with quantum merit, it's a factual question, which was within the province of the trial court. When you look at quantum merit, it was pled and evidence was presented. The primary theory at trial was express contract. However, as pointed out in the Lumetek case, together with those other cases cited in our brief, you can use the same evidence presented on the express contract theory to support the quantum merit theory at trial. What evidence did you present of the value of his services? The testimony of Brent Waldman and the representation agreement itself. Mr. Waldman testified consistent with the representation agreement that the value of services were the percentage components, 3 percent, which the judge found to be $1.5 million in this case. Mr. Berger is taking the position that the expert that the defendants presented placed the value at about $15,000 commensurate with what he charged to testify and act as an expert. The Court is free to consider that when the trier of fact is taking that into account, and the Court is free to take into account the testimony of Brent Waldman stating consistent with the representation agreement and the representation agreement itself, and the representation agreement states $1.2 million to $1.5 million. Let me ask you a question. If you hire a real estate agent to sell your house, they don't earn the commission unless they sell the house. They don't get a quantum merit for trying or they either earn their commission or they don't earn their commission. My impression here under this agreement is there were three things that Waldman had to do and he did one of the three. If you don't earn the commission, you don't get quantum merit. You either get your commission or you don't get your commission. Why is that wrong? Because Mr. Waldman was not acting as a real estate agent in our residential community. You know, I know that. This is not a real estate deal, you know, over a house. I understand that. My point was if you have to do three things, if there are three conditions preceding to earning a commission and he only does one of the three, why is he just not just he's out of luck? Because the terms of the express representation agreement itself. Three. What specifically says he gets paid whether he does his three things or not? The first page under the category referencing the hotel operator component. The number one item, the item with the greatest compensation component. Upon execution, completion and execution of the management agreement with the hotel operator, Mr. Waldman shall receive a 6 percent vested interest. I have a contract in front of me. Where are you referring to? It should be first page toward the bottom and there would be a heading underlined, hotel operator 6 percent. The management operator component? Yes. So that means it says you have to have a completion and execution of a management operator agreement. Yes. And it's undisputed that occurred. Right. And then the other two are separate items with their own separate compensation component. But the difficulty there is that he gets a percentage interest in the project, but you have to have the project have an interest. I mean, it has to be a – it has to come to fruition, doesn't it? And this did come to fruition. The project came to fruition. Mr. Waldman and Ryan were cut out of the remaining components as the defendants took the matter to fruition. But it did come to fruition. The resort is up and running in Mexico. As we go through the remainder of that representation agreement, nowhere does it say that each of those items is dependent upon completion of the other in order for there to be any compensation. Now, Judge Ware focused his attention on the mentor fee, which is on the – I believe it's the second page. And that's the provision that was dictated by the defendants. And in that, the defendants argued at trial they were required to dilute their interest. And by reason of they having to dilute their interest, the mentoring fee component came into play. Correspondence between the defendants and Mr. Waldman on behalf of Ryan made clear that the plaintiff's threshold was 3 percent. It wasn't going below 3 percent in order to do this deal. And so what happens is the defendants said, we had to dilute our interest to make the rest of this financing occur. And, Mr. Waldman, as a result of this, you're going to have to dilute your interest. But if we disagree, Judge Ware's finding, of course, is predicated on this being an enforceable agreement. So if we were to disagree with him on that, that would put us back into your quantum merit claim, correct? That's correct. And I take it that he didn't address that because he thought there was a contractual right, so that he never actually addressed quantum merit for that reason. I believe that's correct. He ruled on the mentoring fee, which is contained within here. Did you at trial argue to him that in the event there wasn't a contract, that there was an alternative grounds for damages or compensation as quantum merit? Implicit within the argument on the express contract theory. Okay. What does that mean? That sounds like a lot of legal words. There's an overlap. We argued that Mr. Waldman performed at the request of the defendants and delivered the benefit. Those are the elements of a quantum merit. Those elements of a quantum merit. No, but I mean, you know, we have these cases that say the judge can't, you know,  So my question is, did you ever say to Judge Ware, if you don't agree with us on the contract, then we should still be compensated in the amount of your argument as the 6 percent? I did not use the words that Your Honor has expressed or expressed it as expressly as that. Okay. So if I wanted to go in the transcript and find the closest thing to that, what would I find? What I said earlier, services provided at the request of the defendants and performance occurred, benefit delivered, benefit retained. And I'm talking hotel operator management agreement component. That was a consistent theme throughout the trial. I'm going to dovetail into the representation agreement unless Your Honors have a different focus or that would not be necessary. When we look at the mentoring fee provision, should the equity partner's return requirements require Ryan Investment to be diluted below 3 percent? Pedregal will compensate Ryan Investment Corporation for services and participation to date in the amount of 3 percent of the combined value of the deal Ryan has assisted in and structured to date. That deal shall be estimated at between 40 to 50 million, 3 percent of which being 1.2 to 1.5 million. The defendants are taking the position that combined value of the deal only has two components. They knock out the hotel operator component and focus on the debt and the equity. The deal has three components. It's undisputed Ryan performed. He participated and contributed in the debt equity structuring, but he did not succeed on those. And it's our position that he was not allowed to succeed. But putting that aside, he did what was required under this mentoring provision to earn the 1.2 to 1.5 that the judge awarded. Going to quantum merit, a measure is the measure of the value of the services provided, and the Court can look to what is set forth in the express agreement to come to that determination, as well as other factors. And if the defendant's expert testifies that the value of the benefit in his professional opinion is 15,000, that's different. And the Court can take that into account, accept or reject that expert's opinion. But the Court did have the evidence before it to make the award it made on a contract theory or on a quantum merit theory. Briefly, with regard to the reference that we've made to judicial admissions, the defendants in their brief had pointed out that they did not think Ryan could rely upon certain pleadings. Finish your sentence and then wrap up. A review of the cases that they cite point out that a judicial pleading such as the answer is binding on the parties and binding on the Court. And the cases that they pointed out dealt with the Ninth Circuit, someone seeking to use after trial a statement in a trial brief as opposed to a true pleading. And I just want to point that out. Thank you very much. Thank you. Mr. Berger, you get the last word. Thank you. Two quick comments. There is no evidence presented and intentionally sold by Mr. Waldman, and we reference this in our briefs, of his time or out-of-pocket expense that he incurred as a result of working on this project. He deliberately chose to not present those data, and they may have well been germane to a quantum merit recovery. So the plaintiff's case was both in terms of evidence, in terms of argument, devoid of anything useful to the trial court regarding quantum merit. On the second point, on this letter between the two sides that counsel in part quoted in response to the Court's question, about six or seven important words were left out of the sentence he quoted. I'm looking at page two, which is in volume two of the exhibit of record, page 69. The 3% of combined value that is there stated as compensation to Ryan in the event of dilution is of the combined value of the deal Ryan Investment has assisted in and estimated between $40 and $50 million U.S. based on the final debt and equity figures. Based on the final debt and equity figures, as of August 28, 2002, that was all guesswork. No hotel operator had been signed up, no debt was in place, no equity was in place. The pro forma projections, one or the other of them, did indicate the thinking that if someone assisted in and structured $40 to $50 million in debt or equity and those sums were delivered to the project to get off the ground, then the project had a chance to get off the ground. What do you say to his argument that on page one of the agreement it says if you get a management operator agreement, which there was, then Ryan Investment would get the 6% vested position? Yes. There's really a two-part answer to that. First, the trial court found that for many reasons set out in the trial court's conclusions, this provision could not be meaningful because none of the preconditions to it had occurred. There were no entities in place. There was nothing to get vested into. And it was just a meaningless concept at that time. And he was using it to leverage as a possible basis for quantum merit. That was never argued. Never. And it was never pointed out. And it would be contrary to the trial court's findings. In addition, 6% is trumped by the mentoring fee agreement when the family that owned the land had to dilute its position below 53%. That 6% becomes a by the nature of their understanding and commitments to each other is no longer in play. Rather, the mentoring fee is in play and we have to look at the mentoring fee provisions to determine any compensation. And that only makes sense because 6% of compensation to Ryan if the family retains, hypothetically speaking, 57% of the project. Makes sense because they then still control it. They still have the 51%. But when they are already below 53% to give up 6% more to someone else, they've lost control of the project, voting control, financing control. And it's not just ownership. It also includes potential income. Thank you. Mr. O'Connor, thank you, too. The case just argued is submitted.
judges: Thompson, Silverman, McKeown